The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: July 10, 2026

**NO. S-1-SC-40574**

**INQUIRY CONCERNING A JUDGE,**
**JSC Inquiry Nos. 2023-061, 2023-078,**
**2024-020, 2024-021, 2024-024,**
**2024-030, 2024-085, 2024-089,**
**2024-090, 2024-111, 2024-130**

**IN THE MATTER OF**
**HON. BRENT A. DETSOI,**
**McKinley County Magistrate Court**

New Mexico Judicial Standards Commission
Phyllis A. Dominguez
Marcus J. Blais
Albuquerque, NM

for Petitioner

Rodey, Dickason, Sloan, Akin & Robb, PA
Jack M. Brant
Charles K. Purcell
Albuquerque, NM

Wiggins, Williams & Wesenberg, PC
Patricia G. Williams
Albuquerque, NM

for Respondent

**OPINION**

**PER CURIAM.**

{1}    This matter came before the Court on a petition for discipline filed by the Judicial Standards Commission (the Commission). As grounds for recommending the immediate and permanent removal of the Honorable Brent A. Detsoi (Respondent) from his position as a magistrate judge in McKinley County, New Mexico, the Commission determined that Respondent had engaged in willful misconduct in a series of thirteen cases in which he raised the issue of criminal jurisdiction sua sponte at various points in cases, including at arraignment and, after informally confirming the respective defendants' Indian status, summarily dismissed each of the prosecutions without sufficient or any notice and without a hearing. Testimony elicited at Respondent's hearing before the Commission indicated that Respondent had dismissed as many as sixty-three criminal prosecutions under similar circumstances. Respondent continued to dismiss criminal prosecutions despite multiple prior occasions on which he was reversed on appeal or counseled, warned, or admonished about the impropriety of such wholesale dismissals by fellow judges, court staff, and Administrative Office of the Courts personnel.

{2}    To counter the Commission's recommendation to discipline and remove him from office, Respondent advances two principal contentions. First, Respondent

argues that the Commission violated principles of fundamental fairness and procedural due process by denying his motion to appoint masters to adjudicate the charges against him. In Respondent's view, the Commission could not be fair and impartial because, in accordance with its own rules, it had overseen the investigation into the allegations of his misconduct and engaged in "secret, *ex parte* communications" with the executive director of the Commission and investigative trial counsel before issuing a notice of formal proceedings and adjudicating the charges against him. *See, e.g.*, Rule jsc-15(G)(1) NMRA ("[U]ntil issuance of a notice of formal proceedings, investigative trial counsel shall report to the Commission at each regular meeting on the progress of an investigation and the response to a notice of investigation. The Commission may monitor reports, direct the nature and extent of the investigation, or dispose of the complaint."). To be clear, Respondent does not argue or offer evidence to support a finding that the Commission was actually biased or prejudged the charges against him;[1] rather, he argues the Commission's dual roles of investigator and adjudicator create the

---

[1]Respondent also conceded at oral argument before this Court that he does not challenge the sufficiency of the evidence in support of the Commission's factual findings in this case.

appearance of prejudgment bias and "a lack of impartiality inherent in the challenged procedure."

{3} Second, Respondent challenges the validity of the Commission's disciplinary recommendation on the ground that the charges against him are founded on nothing more than accusations of simple legal error, which he asserts "[can]not constitute willful misconduct in office . . . [and are not] a permissible basis upon which to discipline a [j]udge." As Respondent sees it, reversal on appeal—not a judge's discipline or removal—is the appropriate remedy for a judge's legal error.

{4} After oral argument, the Court ordered supplemental briefing on Respondent's first argument, limited to the following question: "whether the procedure provided by [the Commission] in this proceeding is constitutional under the New Mexico Constitution." Amended Order, *In re Detsoi*, S-1-SC-40574 (N.M. Nov. 3, 2025). Upon review of the briefing from the parties, we issued an order granting the Commission's petition for discipline and imposing the recommended sanction of removal. Order, *In re Detsoi*, S-1-SC-40574 (N.M. Feb. 25, 2026). At the Commission's request, we now file this opinion to set out the reasoning behind our prior order. Order, *In re Detsoi*, S-1-SC-40574 (N.M. Apr. 13, 2026).

## I.   DISCUSSION

## A.   Standard of Review

{5} In deciding whether to discipline a judge, this Court "undertake[s] an independent evaluation of the record to determine whether clear and convincing evidence supports the Commission's recommendation, but in so doing, . . . give[s] weight to the evidentiary findings of those who were able to judge credibility." *In re Rodella*, 2008-NMSC-050, ¶ 10, 144 N.M. 617, 190 P.3d 338 (per curiam) (internal quotation marks and citation omitted). The meaning of clear and convincing evidence is well established: the evidence "'instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *Id.* (text only)[2] (quoting *State ex rel. Child., Youth & Fams. Dep't v. Joseph M.*, 2006-NMCA-029, ¶ 15, 139 N.M. 137, 130 P.3d 198). And "[t]here need not be clear and convincing evidence to support each and every one of the Commission's evidentiary findings," so long as there is "clear and convincing evidence that there is willful judicial misconduct which merits discipline." *In re Castellano*, 1995-NMSC-007, ¶ 37, 119

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

N.M. 140, 889 P.2d 175 (per curiam). "[W]e review conclusions of law and recommendations for discipline de novo." *In re Griego*, 2008-NMSC-020, ¶ 7, 143 N.M. 698, 181 P.3d 690 (per curiam). Applying our standard of review to this case, we turn first to Respondent's arguments related to the constitutionality of the Commission's procedures. Finding no merit in those arguments, we address his argument about the viability of judicial discipline founded on legal error and determine that he is not entitled to relief based on that theory.

**B.     The Commission Has Wide Discretion Under Article VI, Section 32 of the New Mexico Constitution and as a Matter of Federal Due Process to Decide Whether to Appoint Masters or Hear a Matter Itself Absent Evidence of Unconstitutional Bias**

{6}     A body of binding and persuasive case law already exists to help navigate the question of whether the procedures followed by the Commission in this disciplinary proceeding pass muster under the New Mexico Constitution. As explained below, this Court has repeatedly recognized the Commission's discretionary authority to appoint masters absent evidence of actual or inherent bias under Article VI, Section 32 of the New Mexico Constitution and as a matter of federal due process. This recognition reflects the rule in New Mexico for more than sixty years that, absent evidence of actual or inherent bias, the combining of investigatory and adjudicatory functions by an administrative body is permissible. *See In re Rodella*, 2008-NMSC-050, ¶¶ 5-8 (discussing the history of Article VII, Section 32). This is hardly a

minority view, particularly in the context of judicial disciplinary proceedings; indeed, courts have routinely dismissed and refused to consider arguments such as those advanced by Respondent.

**1.    Role of the Commission**

{7}    From a historical perspective, the Commission was created by constitutional amendment in 1967 for the purpose of "oversee[ing] and investigat[ing] the performance, conduct and fitness of members of the judiciary." *State ex rel. N.M. Jud. Standards Comm'n v. Espinosa*, 2003-NMSC-017, ¶ 2, 134 N.M. 59, 73 P.3d 197 (internal quotation marks and citation omitted). The provisions of Article VI, Section 32 establish the framework of the Commission, define the Commission's membership, and set out the procedure for disciplining or removing a "justice, judge or magistrate of any court" for, *inter alia*, "willful misconduct in office." Article VI, Section 32 authorizes the Commission to investigate potential misconduct and either hold a hearing itself or appoint a panel of masters "to hear and take evidence." "[I]f the commission finds good cause, it shall recommend to the supreme court the discipline, removal or retirement of the justice, judge or magistrate." *Id.* The relevant portion of Article VI, Section 32 provides as follows:

> The commission may, after investigation it deems necessary, order a hearing to be held before it concerning the discipline, removal or retirement of a justice, judge or magistrate, *or* the commission may appoint three masters who are justices or judges of courts of

record to hear and take evidence in the matter and to report their findings to the commission. After hearing or after considering the record and the findings and report of the masters, if the commission finds good cause, it shall recommend to the supreme court the discipline, removal or retirement of the justice, judge or magistrate.

(Emphasis added.)

{8} The New Mexico Constitution assigns this Court an active—and ultimately dispositive—role in those judicial disciplinary cases in which discipline is recommended. Upon receiving a recommendation for discipline from the Commission, the Court "shall review the record of the proceedings on the law and facts" and order any discipline it deems "just and proper." *Id.* The Court also may "wholly reject the recommendation." *Id.* Thus, Article VI, Section 32 creates a scheme in which the Commission "acts as an advisory body, and makes recommendations to this Court, which has the final decision[-]making authority." *Espinosa*, 2003-NMSC-017, ¶ 13.

{9} Article VI, Section 32 says little about the procedures the Commission should follow when investigating and adjudicating alleged judicial misconduct and instead provides that "[t]he commission shall promulgate regulations establishing procedures for hearings under this section." The constitutional provision provides: "No justice, judge or magistrate who is a member of the commission or supreme court shall participate in any proceeding involving the justice's, judge's or

magistrate's own discipline, removal or retirement." *Id.* But relevant here, the constitutional provision explicitly states that the Commission *may* preside over the adjudicatory hearing *or* appoint masters "to hear and take evidence," without providing a standard to guide the Commission in exercising that discretion. *Id.* The Legislature has clarified that masters shall be appointed "if the commission deems it necessary or convenient," a broad and forgiving standard the Commission has also adopted in its own rules. NMSA 1978, § 34-10-2.1(B)(3) (2023); Rule jsc-4(G)(1) NMRA ("[A]t any time the Commission deems it necessary or convenient, it may appoint three (3) masters . . . to hear testimony and receive other evidence."). Plainly, the repeated use of the permissive term *may* together with the disjunctive term *or* in these contexts affords wide discretion to the Commission in deciding whether to hold a hearing itself or instead appoint a panel of masters to do so.

**2. Our precedent supports the Commission's discretion to hear disciplinary matters or appoint masters without violating due process**

{10} Applying these ground rules, this Court held in *In re Rodella* that "the decision whether to appoint special masters is left to the discretion of the Commission" and is reviewed for "an abuse of that discretion." 2008-NMSC-050, ¶ 8; *see also In re Castellano*, 1995-NMSC-007, ¶ 16 (declining to impose limitations on the Commission's "flexibility in adopting procedures" for the appointment of masters). The conclusion in *In re Rodella* came in response to and refuted an argument that

the Commission was politically biased against the respondent judge and should have referred the Commission's "investigation and fact finding . . . to special masters in order to ensure objectivity." 2008-NMSC-050, ¶ 5. The *In re Rodella* Court was "not persuaded that the Commission is either inherently biased or that there is evidence that it was [actually] biased in its investigation or examination of [the judge in that case]." *Id.* ¶ 6. With regard to inherent bias, the Court stated that "there are sufficient checks on political influence, both in the form of confidentiality, and in this Court's power to review the Commission's actions, to ensure the independence of the Commission in fulfilling its role in overseeing judicial conduct." *Id.* ¶ 7. And regarding actual bias, the Court concluded that the respondent judge had not provided evidence to show that the Commission abused its discretion by refusing to appoint masters in his case. *Id.* ¶ 8.

{11}     *In re Rodella* is consistent with *In re Castellano*, an earlier case from this Court, which rejected arguments that due process was violated when the Commission appointed masters who were also members of the Commission.[3] *See* 1995-NMSC-007, ¶ 16. Before addressing the merits, the *In re Castellano* Court

_____

[3]The *In re Castellano* Court did not specify whether it decided that case under the federal or state constitutional guarantee of due process. While the Court's silence suggests it relied on the federal right to due process, the Court's reasoning seems rooted in general principles of fairness, rather than any specific understanding or application of federal law. *See In re Castellano*, 1995-NMSC-007, ¶¶ 15-16.

acknowledged that the Commission proceedings "must be conducted to provide the respondent with procedural due process." *Id.* ¶ 15; *accord In re Rodella*, 2008-NMSC-050, ¶¶ 5-8 (considering whether the Commission was unconstitutionally biased against the respondent judge, an issue that sounds in due process). The *In re Castellano* Court also announced a harmless error standard for procedural errors in the Commission proceedings, holding errors will not affect the Court's review "unless the errors actually prejudiced the respondent."[4] 1995-NMSC-007, ¶ 15.

{12} Addressing the merits, the *In re Castellano* Court disagreed that the masters' participation in multiple stages of the proceedings violated due process. *Id.* The Court saw "no basis in the record for finding . . . conduct that could be viewed as having predetermined the facts," even in circumstances where the masters had presided over the respondent judge's hearings, issued findings of fact and conclusions of law recommending his removal, and voted with the Commission to recommend his removal by the Court. *Id.* ¶¶ 13, 15. The Court also disagreed that the Commission had given "disproportionate influence" to its member-judges by

---

[4]Respondent has not offered evidence or argument that unconstitutional bias actually affected the outcome of this proceeding. Therefore, even if we were to agree with Respondent that the Commission's dual roles create the appearance of prejudgment bias and a "lack of impartiality inherent in the challenged procedure" such that the Commission should have appointed masters in this case, Respondent simply has not shown—or even claimed—that he suffered resultant prejudice as *In re Castellano* requires.

appointing them as masters. *Id.* ¶ 16. The Court readily acknowledged that "[c]hoosing special masters who are not Commissioners might be a wise precaution against an erroneous perception of even greater influence." *Id.* But because the masters were "judges of courts of record" and therefore met the sole qualification for appointment under Article VI, Section 32, their appointments nonetheless satisfied due process. *In re Castellano*, 1995-NMSC-007, ¶ 16.

{13}     A final aspect of the parallel reasoning of *In re Rodella* and *In re Castellano* is noteworthy. In both cases, the Court emphasized the distinct roles assigned to the Commission and the Court under Article VI, Section 32, recognizing that the Commission's authority is limited to "recommend[ing discipline or] removal to this Court," while this Court "independently review[s] the proceedings below to determine, de novo, whether to accept the recommendation of the Commission." *In re Rodella*, 2008-NMSC-050, ¶ 8; *In re Castellano*, 1995-NMSC-007, ¶ 15 (citing *In re O'Dea*, 622 A.2d 507, 514 (Vt. 1993), as standing for the proposition that a "due process violation [is] less likely when [an] administrative body is not [the] final decision[-]making authority"). The Court's role as "the final decision[-]making authority" thus serves as a significant safeguard against accusations of bias in a particular case. *Espinosa*, 2003-NMSC-017, ¶ 13.

{14} At bottom, *In re Rodella* and *In re Castellano* provide a ready framework for determining whether the Commission's procedures in this case pass muster under the New Mexico Constitution. Be it based on the explicit provisions of Article VI, Section 32 or as a matter of basic fairness and due process, this Court has long deferred to the Commission's discretion to appoint masters, absent evidence of unconstitutional bias that "prejudiced the respondent [judge]." *In re Castellano*, 1995-NMSC-007, ¶ 15; *see also In re Rodella*, 2008-NMSC-050, ¶ 8. And particularly in *In re Castellano*, the Court saw no cause for concern even though the masters' participation throughout the Commission's proceedings was extensive. *See In re Castellano*, 1995-NMSC-007, ¶¶ 13, 15. Absent any suggestion of unconstitutional bias or resulting prejudice in this case—and indeed with no challenge whatsoever to the Commission's factual findings overall—it is clear that, under governing New Mexico case law, the Commission neither abused its discretion under Article VI, Section 32 nor violated general principles of due process when it opted not to appoint masters to adjudicate the charges against Respondent.

**3. This Court's longstanding interpretation of federal due process in the administrative context additionally undercuts Respondent's position**

{15} Even beyond *In re Rodella* and *In re Castellano*, this Court has long adopted the consensus—if not unanimous—view that, as a matter of federal due process, an administrative agency's dual role as investigator and adjudicator does not, "in itself,"

create an unconstitutional risk of bias. *Seidenberg v. N.M. Bd. of Med. Exam'rs*, 1969-NMSC-028, ¶ 24, 80 N.M. 135, 452 P.2d 469 ("The fact that charges are made by the same body which tries the issues does not, in itself, operate as a disqualification."). This approach is consistent with a long line of federal jurisprudence on the issue. *See Withrow v. Larkin*, 421 U.S. 35, 54-55 (1975) (holding there was no violation of due process where adjudicators presided over hearings on charges they themselves investigated); *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 468 (5th Cir. 2015) (recognizing that "an agency's dual role of investigating and adjudicating disputes and complaints does not alone demonstrate unconstitutional bias" (text only) (citation omitted)). In order to establish a due process violation in the judicial disciplinary context, adherence to this approach requires a showing "that the Commission [was] either inherently biased or that there [was] evidence that it was [actually] biased in its investigation or examination of [the respondent judge]." *In re Rodella*, 2008-NMSC-050, ¶ 6. The combined force of the holdings in *Seidenberg* and *Withrow* undermine a determination that the Commission was inherently biased as a structural matter, while Respondent's full acceptance of the factual findings made by the Commission below all but preclude a determination that the Commission was actually biased in this case.

**4. Similar procedures have been unanimously upheld by state courts nationwide under substantively identical challenges**

{16}   Looking to other state court jurisdictions for guidance, there seems to be near unanimity that a judicial disciplinary body's combined investigatory and adjudicatory functions do not violate due process. Because these cases are heavily influenced by the United States Supreme Court's holding to that effect in *Withrow*, we summarize *Withrow*'s holding and rationale before discussing the uniform out-of-state authorities that cut against Respondent's position here.

{17}   Similar to the approach taken by Respondent in this case, the physician in *Withrow* objected to a licensing board's dual roles of investigator and adjudicator in overseeing his disciplinary proceeding, arguing the arrangement would violate the physician's right to a neutral, detached decisionmaker. *See* 421 U.S. at 38-39, 42. The United States Supreme Court acknowledged that due process requires "a fair trial in a fair tribunal," including in administrative agencies. *Id.* at 46 (internal quotation marks and citation omitted). The Court also noted circumstances when "the probability of actual bias . . . is too high to be constitutionally tolerable," such as when a decisionmaker "has a pecuniary interest in the outcome . . . [or] has been the target of personal abuse or criticism from the party before him." *Id.* at 47 (footnote omitted). But the Court remained unpersuaded that "conferring investigative and adjudicative powers on the same individuals poses such a risk of

actual bias or prejudgment that the practice must be forbidden." *Id.* Rather, the Court established "a presumption of honesty and integrity in those serving as adjudicators" that may be overcome with contradictory evidence, on a case-by-case basis. *Id.* "Without a showing to the contrary, state administrators are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *Id.* at 55 (internal quotation marks and citation omitted).

{18}    In the matter at hand, the Commission cites persuasive authority from other jurisdictions citing and reaching the same conclusion as *Withrow*, specifically in the context of judicial disciplinary proceedings. *See Gentry v. Jud. Conduct Comm'n*, 612 S.W.3d 832, 841 (Ky. 2020) (citing *Withrow* in concluding that the judge under investigation "offer[ed] no persuasive evidence to overcome the presumption of lack of bias" purportedly resulting from "the combined investigative and adjudicative functions of the [c]ommission"); *Adams v. Comm'n on Jud. Performance*, 897 P.2d 544, 550 (Cal. 1995) (en banc) (discussing precedent that relied on *Withrow* to reject the argument that "the [c]ommission did not provide a neutral forum, because the accusatory, investigatory, and adjudicatory functions were combined so that the adjudicatory process did not comport with generally accepted standards of due process"); *In re Zoarski*, 632 A.2d 1114, 1121 (Conn. 1993) (citing *Withrow* and

other cases in rejecting the judge's argument that due process was violated when "members of the council . . . conducted the investigatory hearing that led to a finding of probable cause and thereafter . . . adjudicated the ultimate merits of the charges against him").

{19} Further, in a case cited by neither party, the Alaska Supreme Court explained that as of 1975, twenty-four states, including New Mexico, had adopted procedures allowing "the [c]ommission both to conduct a preliminary investigation and to adjudicate facts and make a recommendation to the supreme court."[5] *In re Hanson*, 532 P.2d 303, 306 & n.9 (Alaska 1975). Disagreeing that this "combination of judicial and investigative functions" violated due process "under [either] the federal constitution or Alaska's constitution," the *In re Hanson* court observed that the "argument has been rejected by all courts which have considered the question." *Id.* at 306; *see also In re Del Rio*, 256 N.W.2d 727, 736 (Mich. 1977) (per curiam) ("[T]he authority is legion in support of the proposition that combining the investigative and adjudicative roles in a single agency does not necessarily violate due process in administrative adjudications such as judicial fitness hearings."). Since

---

[5]At oral argument in this case, the Commission represented that New Mexico is one of thirty-three states currently operating under a "single-tiered system," where the judicial disciplinary body investigates and adjudicates charges against a judge before recommending discipline to the state's high court.

then, the trend of rejecting arguments similar to the one advanced by Respondent herein has continued, most recently in 2022 by the Michigan Supreme Court. *See In re Morrow*, 976 N.W.2d 644, 651 (Mich. 2022) (per curiam) (reaffirming under *Withrow* that the Michigan commission's combined investigatory and adjudicative functions do not violate due process).

{20}     *In re Hanson* also presaged this Court's approach in *In re Rodella* on two important points. First, in holding that the Alaska commission's dual functions "did not result in a biased or partial tribunal," the Alaska Supreme Court emphasized its own role in the disciplinary process, noting that it has "the ultimate authority in disciplinary matters affecting the judiciary." *In re Hanson*, 532 P.2d at 306-07; *accord In re Rodella*, 2008-NMSC-050, ¶ 8. Second, the Alaska high court rejected an argument—identical to the one made by Respondent here—that due process was violated by the Alaska commission's "option to hear the matter itself or to refer the charges to a master for a hearing." *In re Hanson*, 532 P.2d at 307 & n.15. The *In re Hanson* court found it "untenable" that "the [c]ommission must always appoint a master," reasoning as follows:

> The [c]ommission should have the option of referral to a master where the particular matter requires extensive testimony or specialized fact-finding. On the other hand, where the [c]ommission wishes to handle the matter without appointment of a master, we can discern no legal impediment to proceeding in such a manner.

*Id.* at 307. Thus, as in New Mexico, the decision whether to appoint a master in *In re Hanson* was properly entrusted to the commission's discretion. *Accord In re Rodella*, 2008-NMSC-050, ¶ 8.

{21} The rule appears to be unanimous in New Mexico and elsewhere that the Commission's combined investigatory and adjudicatory functions do not, of themselves, violate generally accepted standards of due process, including in the many states that employ judicial disciplinary structures and procedures substantially identical to those in use in New Mexico. Effectively conceding as much, Respondent urges this Court to "part company with *Withrow*" and its progeny by invalidating the Commission's procedures through a broadening of the due process provisions of Article II, Section 18 of the New Mexico Constitution. For reasons discussed below, we decline Respondent's request.

**C. Respondent Has Offered No Persuasive Reason to Depart from Our Existing Procedural Due Process Protections in the Judicial Disciplinary Context in New Mexico**

{22} In undertaking an interstitial analysis[6] in support of his state constitutional claim, Respondent invokes two of the three grounds generally relied on to justify a state constitutional departure from federal jurisprudence: first, that "the federal analysis [in *Withrow*] is flawed," and second, that "distinctive state characteristics exist that would support the departure." *See State v. Crane*, 2014-NMSC-026, ¶ 15, 329 P.3d 689 (citing *State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1). As we explain, Respondent misses the mark on both points.

{23} To begin, Respondent likens the situation at bar to that presented to this Court in *State v. Martinez*, 2021-NMSC-002, ¶¶ 36, 85, 478 P.3d 880, in which we agreed to construe the due process provisions of Article II, Section 18 of our state Constitution more broadly than its federal counterpart in assessing the admissibility of eyewitness identification evidence. The chief inspiration underlying this doctrinal

---

[6]Respondent acknowledges this Court's invitation in *Lujan Grisham v. Van Soelen*, 2023-NMSC-027, ¶ 19 n.7, 539 P.3d 272, to revisit whether the interstitial approach still serves New Mexico and promotes the development of independent state-constitutional protections. But Respondent has chosen to adhere to the interstitial method in his argument here, maintaining that it remains the law and "neither alters the outcome of the present inquiry nor fails to give the New Mexico Bill of Rights its due."

sea change was "the substantial body of empirical scientific studies on human memory and perception undertaken in the wake of [the, then outdated, governing federal precedent] and the legal literature, decisional law, and statutory enactments that have developed accordingly." *Id.* ¶ 38. Clearly, the "vast body of social science research" and "[t]he legal literature . . . replete with discussions of the doctrinal and scientific shortcomings of the [federal] reliability test" that were presented to the *Martinez* Court, *id.* ¶¶ 40, 53 (internal quotation marks and citation omitted), are a far cry from the sparse—three in all—and narrowly conceived psychological journal and law review articles relied on by Respondent in this case. While this trio of commentaries—primarily addressing a concept known in the scientific community as *confirmation bias*[7]—may provide an articulable basis to question the rationale supporting the Commission's joint investigative and adjudicatory framework, these isolated writings are inadequate, standing alone, to warrant the complete abandonment of a long-held administrative practice.

---

[7]*Confirmation bias* has been defined as "bias that results from the tendency to process and analyze information in such a way that it supports one's preexisting ideas and convictions." *Confirmation bias*, *Dictionary.com*, https://www.dictionary .com/browse/confirmation-bias [https://perma.cc/RE72-FD9Y] (last visited June 2, 2026).

{**24**}    And despite Respondent's protestations to the contrary, New Mexico case authorities such as *Reid v. New Mexico Board of Examiners in Optometry*, 1979-NMSC-005, 92 N.M. 414, 589 P.2d 198, and *New Mexico Board of Veterinary Medicine v. Riegger*, 2007-NMSC-044, 142 N.M. 248, 164 P.3d 947, provide no persuasive basis to depart from the teachings of *Seidenberg* and *Withrow* in the matter now before us. As explained below, neither *Reid* nor *Riegger* establishes any distinct feature of New Mexico law that would afford Respondent an expanded right to greater due process protections during disciplinary proceedings than *Seidenberg* and *Withrow* now provide.

{**25**}    As Respondent would have it, "*Reid* calls for heightened vigilance against denials of due process in administrative settings," in contrast to *Withrow*'s more permissive approach in entertaining what the United States Supreme Court described therein as a rebuttable "presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. Respondent further argues that since *Reid* was decided, this Court has favored its requirement that there need be "the appearance of complete fairness" in administrative proceedings, *Reid*, 1979-NMSC-005, ¶ 7, over *Withrow*'s above-stated "presumption of honesty and integrity," *Withrow*, 421 U.S. at 47. But the only support Respondent offers for these assertions is *Riegger*, which held that allowing the Board of Veterinary Medicine's recovery

of costs for both the hearing officer who served the agency and the hearing room used by the agency would violate the accused veterinarian's due process rights. *See* 2007-NMSC-044, ¶ 26. This Court in *Riegger* concluded that allowing the recovery of a hearing officer's costs would create "a possibility that future licensees subject to disciplinary proceedings may objectively believe that hearing officers will be biased in order to be fully-compensated for their services." *Id.* ¶ 30. The *Riegger* Court acknowledged that neither party had accused the hearing officer of bias and that the record demonstrated a lack of actual bias on the hearing officer's part. *Id.* Nonetheless, the Court held that the appearance of potential bias outweighed the *Withrow* "presumption of honesty and integrity in those [who serve as] adjudicators." *Riegger*, 2007-NMSC-044, ¶ 30 (internal quotation marks and citation omitted). Thus, Respondent's argument goes, *Riegger* demonstrates the Court's preference for a more protective rule than *Seidenberg* and *Withrow* presently require.

{26}     Respondent overstates the holdings in both *Reid* and *Riegger* in arguing that they support a higher standard of neutrality in administrative proceedings under Article II, Section 18. This Court's prior analysis in each of the two cited cases is inapposite to the facts now before us and therefore is not binding here. Neither *Reid* nor *Riegger* spoke directly to the core structural issue litigated in this matter: how

best to treat the combined investigative and adjudicative functions of the Commission. Instead, *Reid* primarily serves to illustrate the general rule that due process is violated when there is evidence that an adjudicator may have been biased, demonstrated by "a prejudicial statement" made by one of the board members that signaled "his bias and prejudgment of the issues." *Reid*, 1979-NMSC-005, ¶¶ 5, 9. And *Riegger*, for its part, represents little more than a straightforward application of the age-old prohibition against a judge presiding over a matter in which the judge has a pecuniary interest in the outcome. *See, e.g.*, *State ex rel. Hannah v. Armijo*, 1933-NMSC-087, ¶ 22, 38 N.M. 73, 28 P.2d 511 ("By the common law, the slightest pecuniary interest would disqualify a judge."); *see also* Rule 21-211(A)(3) NMRA (requiring a judge to disqualify themself "in any proceeding [when] . . . [t]he judge knows that [they have] . . . an economic interest in the subject matter in controversy").

{27}     Neither *Reid* nor *Riegger* can be read to stray from the core rule articulated in *Seidenberg* and *Withrow* that, absent evidence of unconstitutional bias, the combination of investigative and adjudicatory functions in the administrative realm does not violate due process. We thus conclude that neither *Reid* nor *Riegger* is imbued with any distinctive state characteristics relevant to this case that would

warrant an expansion of the due process provisions of Article II, Section 18 of our state Constitution.

{28}	Having rejected Respondent's constitutional challenges to the Commission's disciplinary recommendation, we turn next to Respondent's alternative argument that even if he committed legal error as alleged—which he steadfastly refuses to concede—his actions did not rise to the level of willful misconduct subject to discipline. As will be shown below, this contention too must fail.

**D.	The Commission Properly Relied on the Series of Improper Case Dismissals Ordered by Respondent as a Basis for Discipline in This Case**

{29}	Respondent relies on the committee commentary to the "[i]mpartiality and fairness" requirement of the Code of Judicial Conduct contained in Rule 21-202 NMRA, which provides: "When applying and interpreting the law, a judge sometimes may make good-faith errors of fact or law. Errors of this kind do not violate this rule." That guidance, in Respondent's view, is consistent with rulings from other jurisdictions that emphasize the importance of judicial independence and the freedom to make good-faith rulings, "free from extraneous considerations of punishment or reward." *In re Curda*, 49 P.3d 255, 261 (Alaska 2002); *see also, e.g., Oberholzer v. Comm'n on Jud. Performance*, 975 P.2d 663, 680 (Cal. 1999) ("[A] judge must be free not only to make the correct ruling for proper reasons, but also to

make an incorrect ruling, believing it to be correct.").[8] Respondent insists that reversal on appeal is the appropriate remedy for a judge's legal error, not judicial discipline.

{30} The Commission, on the other hand, asserts in its petition seeking Respondent's removal from office that its disciplinary recommendation is not based on "mere legal mistakes." Instead, the Commission maintains that Respondent's repeated dismissal of cases on jurisdictional grounds at the preliminary arraignment stage of multiple proceedings and without a hearing, "despite repeated guidance from mentors, peers, and higher courts" to refrain from such conduct, "reflects intentional, repeated, and egregious legal error made in bad faith, clearly exceeding the threshold established by this Court and consistent with standards adopted in other jurisdictions." The Commission goes on to argue that discipline is warranted because

---

[8]These citations, and their accompanying quotations, are taken directly from Respondent's briefing to this Court. While the quotations are accurate, they do not represent the actual holdings of the cases from which they are taken. In *In re Curda*, for example, the Alaska Supreme Court ultimately held that "legal error that is neither willful nor part of a repeated pattern of misconduct is not an appropriate subject for discipline." 49 P.3d at 261. Similarly, the California Supreme Court in *Oberholzer* held as follows: "[A] judge who commits legal error which, *in addition*, clearly and convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty, is subject to investigation." 975 P.2d at 680 (citations omitted). Neither of these holdings is consistent with the blanket rule sought by Respondent in this case.

Respondent engaged in a "pattern of defiance—rooted in a personal and expansive view of tribal boundaries rather than binding precedent—[that] demonstrates a willful disregard for the judge's duty to apply the law as it exists."

{31} Respondent's contention is foreclosed by *In re Locatelli*, 2007-NMSC-029, ¶ 6, 141 N.M. 755, 161 P.3d 252 (per curiam), a case in which this Court considered the respondent municipal judge's analogous argument that legal error presents a "question for the appellate courts" and "should not expose [the respondent] to discipline." The *In re Locatelli* Court disagreed, holding that legal error may support discipline when there is clear and convincing evidence that the alleged error amounted to "[w]illful misconduct in office[, which] is improper and wrong conduct of a judge acting in his official capacity done intentionally, knowingly, and, generally, in bad faith." *Id.* ¶¶ 7-8 (first alteration in original) (internal quotation marks and citation omitted). This Court clarified, however, that to constitute willful misconduct, the challenged conduct must be "more than a mere error of judgment or an act of negligence." *Id.* ¶ 8 (internal quotation marks and citation omitted). Applying that standard, the *In re Locatelli* Court rejected the recommendation for discipline based on the Commission's findings that the judge had improperly held two lawyers in contempt without a legal or factual basis. *Id.* ¶¶ 9, 11, 17. The Court held that the Commission's disciplinary recommendation was not supported by clear

and convincing evidence in circumstances where the judge was, in fact, bestowed with the authority to hold the attorneys in contempt and the judge provided uncontradicted testimony that he had "researched what action he could take" under the circumstances and had "consulted with attorneys from the Municipal League and the Attorney General's Office" before taking action in holding the attorneys in contempt. *Id.* ¶¶ 13-16. That the judge charged the attorneys with contempt without procuring or reviewing the transcript of the district court proceedings served only to show that the judge had been negligent in his contempt rulings, a showing insufficient—on its own—to support a finding of willful misconduct. *Id.* ¶ 17.

{32}     The reasoning employed by the *In re Locatelli* Court, while reaching a different result than that produced here, plainly endorses the Commission's ability to recommend discipline based on "improper and wrong conduct," including legal error, so long as the conduct rises to the level of willful misconduct. *Id.* ¶ 8 (internal quotation marks and citation omitted). As this Court made clear in *In re Rodella*, discipline is often imposed on judges based on their "patterns of behavior," 2008-NMSC-050, ¶ 35 (internal quotation marks and citation omitted), a conclusion buttressed by commentators and courts alike. *See, e.g.*, Cynthia Gray, *The Line Between Legal Error and Judicial Misconduct: Balancing Judicial Independence and Accountability*, 32 Hofstra L. Rev. 1245, 1263-64 & n.98 (2004) (recognizing

that "most cases in which judicial error [is] elevated to the level of judicial misconduct involve[] more than one example of legal error"; that "a pattern is one of the identified exceptions to the 'mere legal error' rule"; and, citing *In re Holien*, 612 N.W.2d 789, 792-93 (Iowa 2000) (en banc), that "[j]udges have been sanctioned for patterns of . . . violating procedural requirements when conducting arraignments").

{33} And considering Respondent's choice in this case to forego any challenge to the Commission's factual findings, we are left with a record that establishes Respondent's habitual practice—often at arraignments and without the benefit of a hearing—of "routinely dismiss[ing] matters *sua sponte* . . . if he [determined that] jurisdictional issues were present on the face of a complaint." He did this "despite repeated guidance [to the contrary] from mentors, peers, and higher courts."

{34} We emphasize that, as a general matter, "[t]he burden [is on the] defendant to demonstrate a lack of jurisdiction in the district court." *State v. Cutnose*, 1974-NMCA-130, ¶¶ 4-7, 87 N.M. 307, 532 P.2d 896; *see also, e.g., State v. Verdugo*, 901 P.2d 1165, 1168 (Ariz. Ct. App. 1995) ("The majority of other courts addressing this issue have held that a defendant bears the burden to show facts that would establish an exception to the state court's jurisdiction under the Indian Country Crimes Act."). And such a determination demands an opportunity for the State to

present evidence to support its case. *See, e.g., State v. Gomez*, 2003-NMSC-012, ¶ 7, 133 N.M. 763, 70 P.3d 753 ("[P]retrial dismissal under Rule 5-601(B) [NMRA] is inappropriate if the State could reasonably assert the availability of additional evidence."); *cf.* Rule 6-305(A)(2) NMRA ("It shall be unnecessary for a complaint to contain the following allegations unless such allegations are necessary to give the defendant notice of the crime charged: . . . place of the commission of the offense."). Respondent's repeated practice of dismissing cases at arraignment and without hearings constituted legal error that clearly and consistently rose to the level of willful misconduct. Stern discipline was in order. We turn next—and finally—to the question of the appropriate level of discipline warranted in this case, a question that stands "separate from the question of whether the evidence supports a determination that the judge's actions constituted willful judicial misconduct." *In re Castellano*, 1995-NMSC-007, ¶ 39.

**E.    Respondent's Pattern of Willful Misconduct Was More than Sufficient to Warrant His Removal from Office**

{35}    Traditionally, this Court has "removed judges from the bench when their conduct threatened the integrity and independence of the judiciary." *In re Rodella*, 2008-NMSC-050, ¶ 34, citing, *inter alia*, *In re Castellano*, 1995-NMSC-007, ¶ 40 (removing the judge because of a "pattern [of behavior that] adversely affected his reputation for impartiality, independence, and integrity"). The impetus to remove a

judge from office for engaging in such a pattern of behavior is only heightened where, as the Commission found to be the case here, the judge wrongly shows not "remorse but demonstrated defiance [by] insisting that his interpretation of the law was correct" in offering "evasive" testimony determined not to be "credible." As the *In re Rodella* Court reasoned:

> In this case, we see a pattern of misconduct that was not corrected, but which increased in its seriousness, despite training and mentoring. In addition, we are deeply troubled by the Commission's determination, which our independent review of the record supports, that Judge Rodella's testimony lacked credibility. When a new judge, through lack of knowledge, experience or judgment, acts in ways that are inconsistent with [a judge's] new role, we hope that such conduct can be corrected through discipline in the form of training, mentoring, and supervision. However, when a judge denies making mistakes, [the judge] cannot learn from the mistakes, and there is little that can be done to correct the behavior. Under such circumstances, to allow a judge who is not truthful to remain on the bench betrays the public trust and threatens the integrity and independence of the judiciary as a whole. . . . [W]e cannot allow a judge who lacks credibility to preside over cases in which he is charged with weighing evidence and determining the credibility of others.

2008-NMSC-050, ¶ 36 (internal quotation marks and citation omitted). The same rationale applies here.

## II.    CONCLUSION

{36}    For the foregoing reasons, we conclude that Respondent committed willful misconduct in office and stand by our prior order directing his permanent removal from the bench.

**{37}** **IT IS SO ORDERED.**

**JULIE J. VARGAS, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**